**Thomas A. GRANT and Julia L. Grant, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 599.**

United States District Court
W. D. Virginia,
Harrisonburg Division.

March 1, 1962.

H. Brice Graves, and Waller H. Horsley, Richmond, Va., for plaintiffs.

Thomas B. Mason, U. S. Atty., Roanoke, Va., for defendant.

MICHIE, District Judge.

Thomas A. Grant and Julia L. Grant are taxpayers who have brought this action against the United States for a refund of income taxes paid by them for the years 1954, 1955 and 1956.

There is no dispute as to the facts which have been stipulated by the parties. A brief statement of them follows.

William A. Leggett was a brother of Mrs. Grant and, with others of the Leggett family, an owner of the chain of stores, in Virginia, North Carolina and other states in the area, known as Leggett's. William A. Leggett died on October 30, 1943. By his will, after providing for the payment of debts, taxes, etc. and six specific cash legacies, he pro-

vided that the remainder of his estate, which consisted primarily of stock in the various Leggett companies, should be divided into three equal trusts of which we are concerned with only one, in which Mrs. Grant was designated as the life income beneficiary and her children as the remaindermen.

As Mr. Leggett's wealth was almost wholly in the stock of the family corporations his executors found that there were not enough liquid assets to pay the administration expenses, estate taxes and specific cash legacies. And they, and presumably also the other members of the family, did not wish to sell to outsiders any of the stock in the Leggett companies. Consequently the executors in January 1945 borrowed $75,000.00 from members of the family to clean up these items and paid the estate tax in that year except for a small additional tax which was paid in 1946. Of the sum so borrowed Mrs. Grant lent to the executors $10,000.00.

The executors then transferred the remaining assets in their hands to the three trusts set up by the will, the trustees of the trusts assuming their respective shares of the $75,000.00 of indebtedness. The executors thereupon wound up the estate and were discharged on May 28, 1948.

One of the three trusts was for the benefit of the mother of Mrs. Grant who died on March 24, 1946 and after her death that trust continued for the benefit of certain infant beneficiaries. The trustees were authorized to accumulate income for the benefit of the infants and they did this and used the income so accumulated to pay off that trust's portion of the total $75,000.00 indebtedness. No such solution was possible, however, in the case of the other two trusts for Mrs. Grant and her sister, since the trustees of those trusts were required to distribute all of the income annually to Mrs. Grant and her sister, respectively. Consequently it appeared that there was no way of paying off the debts of those trusts except by the sale of assets. Certain assets, presumably not stock in the Leggett companies, were sold by the trustees which reduced the indebtedness of each of those trusts to $19,050.00. But there appeared no prospect of paying off the balance of the debt of Mrs. Grant's trust during her lifetime except by a sale of some of the Leggett stock which was not deemed a desirable solution.

Consequently someone devised a plan which was carried out under which Mrs. Grant paid over to the trustees of her trust the sum of $11,322.20 and Mr. Grant paid to those trustees the sum of $7,727.-80 making a total of $19,050.00 which was the total of the remaining indebtedness of Mrs. Grant's trust and the trustees used this money so paid in to them to pay off that indebtedness. The $11,-322.20 paid over by Mrs. Grant was an amount equal to the value of a life estate for her in a fund of $19,050.00 on October 4, 1950 as determined by reference to the Actuaries' or Combined Experience Tables of Mortality (the then "Table A" of the Commissioner of Internal Revenue) and consequently the $7,727.80 paid over by Mr. Grant was equal to the then similarly calculated value of the remainder interest of the children, such payment being in effect a gift by Mr. Grant to his children. These payments were made in 1950 pursuant to an agreement of October 14, 1950, nearly two and one-half years after Mr. Leggett's estate had been closed and nearly six years after the loan was originally made to the executors.

Under this state of facts the taxpayers claim that they are entitled to amortize the payment made by Mrs. Grant in the sum of $11,322.20 over the period of her life expectancy under the provisions of § 167 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 167 which provides, insofar as applicable, as follows:

"(a) General rule.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

"(1) of property used in the trade or business, or

"(2) of property held for the production of income."

The taxpayers also rely on § 1.167(a)–3 of the Regulations which provide in part as follows:

"Intangibles. If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance."

The taxpayers' contention in a nutshell is that by the two payments by Mr. Grant and Mrs. Grant of $19,050.00 to the value of the trust, Mrs. Grant in effect purchased a life estate in this $19,050.00 of added value by the payment to the trust of $11,322.20; that the asset thus purchased has a limited life, to wit, the life of Mrs. Grant, and that it is being exhausted as Mrs. Grant grows older and will cease to have any value upon Mrs. Grant's death; and further that the duration of that life may be reasonably calculated by the application of the usual life expectancy tables. It follows from these premises that Mrs. Grant should be entitled to an annual deduction for income tax purposes equal to the sum of $11,322.20 divided by her life expectancy.

The government on the other hand claims that § 167 is not applicable to this type of transaction in that the transaction "did not constitute the purchase of a life estate but was merely the repayment of borrowed money, part of which had been borrowed from her" and also that it was in fact a payment of estate taxes for which no deduction from income is allowable by virtue of the express provisions of Int.Rev.Code § 164(b) (4), 26 U.S.C.A. § 164(b) (4), which reads, so far as material, as follows:

"(b) *Deduction denied in case of certain taxes.*—No deduction shall be allowed for the following taxes:

\*      \*      \*      \*      \*      \*.

"(4) Estate, inheritance, legacy, succession, and gift taxes."

I believe the government is wrong in both contentions and that the deductions should be allowed.

Certainly the net value of the trust estate was increased by $19,050.00 by the payment of this sum to it and its use to pay off the trust's debts. And certainly the added value constitutes an asset which will produce income for Mrs. Grant for only a limited period, the length of which can be estimated with reasonable accuracy unless we are going to stop using life expectancies altogether in tax cases which the government could hardly contend.

Clearly if Mr. and Mrs. Grant had created a wholly new trust with income payable to Mrs. Grant for life and the remainder to the children and had put into it the sums that they did respectively add to the actual existing trust it would be obvious that Mrs. Grant had invested $11,322.20 in a $19,050.00 asset in which her life interest was subject to exhaustion. But the fact that such an addition was made to an existing trust instead of by way of setting up a new trust should not in any way alter the tax consequences. Nor should it be significant that at some previous time Mrs. Grant had lent money to the executors of her brother's estate, a part of which indebtedness had been assumed by the trust created for her and her children and was repaid to her when the payment of $19,050.00 was made by Mrs. Grant and her husband. It is still true that Mrs. Grant by making her share of that $19,050.00 payment increased the net worth of the trust in which she had a life estate by $19,050.00. She paid $11,322.20 for this increase in the value of the trust and since it will be exhausted at her death she is entitled under § 167 to amortize what she paid for the increase in value.

■ The whole transaction was the equivalent of a purchase for $11,322.20 of a life estate in $19,050.00. It is well settled that the purchase price of a life estate is ordinarily amortizable.

As Mertens says in The Law of Federal Income Taxation (1960 revision), §§ 23.63a, 23.64:

"If one purchases an outstanding life estate, the term of which is measured either by the life of the tenant or of another person, the purchaser is entitled to amortize the cost of his purchase over the life expectancy of the measuring life. It has also been held that this rule is equally applicable where a remainderman purchases the life interest in his estate, on the ground that there is no merger of the life estate with the remainder interest. The Commissioner continues to contest this question, urging a merger of the two estates.

" * * * The 'depreciation' provisions of the Code relate to 'exhaustion', as well as to 'wear and tear' and 'obsolescence.' The end sought in an exhaustion allowance is to have the capital sum invested in a wasting asset returned to the taxpayer as a charge against income earned by the asset and in this way to avoid taxing a return of capital. The allowance is grounded on the fact that most kinds of property approach a point where the usefulness is exhausted either through actual wear and tear, the normal progress of the art, or the effusion of time. Such an allowance may be made with respect to assets employed in the business, where the lessening in value or their exhaustion is attributable entirely to their gradually diminishing life measured in periods of time, such as copyrights, leaseholds and patents. This principle has been extended to contracts and it is now well recognized that for income tax purposes deductions may be taken by a taxpayer for exhaustion of contracts and like property where there is a cost or March 1, 1913, value, or other statutory basis of such property, and such property has a definite determinable life and is used in the trade or business or held for the production of income * * *"

When the purchase of an outstanding life estate has been made by the remainderman the Commissioner has often sought to disallow amortization on the highly technical ground that there had been a merger of the life estate on the theory that upon the remainderman's purchase of the life estate it was merged into the remainder and therefore there was nothing left to amortize. But the government has not had much success with that theory. See Bell v. Harrison, 212 F.2d 253 (7th Cir. 1954). But here it cannot be argued that the life estate has been extinguished since it continues to exist as before but in an enlarged fund.

The situation is very much like that in Caroline T. Kissel, 15 B.T.A. 705 (1929), Acq. and Non.-Acq., VIII–2 C.B. 28, 66. In that case the owner of a life estate in real estate put up a building on the property, the life of which would extend beyond the life expectancy of the life tenant. This constituted of course an enhancement in the value of the property subject to the life estate, just as in this case the payments by Mr. and Mrs. Grant enhanced the value of the trust in which Mrs. Grant had a life estate. The Board approved amortization by the life tenant of the cost of the building over the tenant's life expectancy and said:

"Petitioner did not acquire her life interest in the new building by gift, bequest or inheritance. She acquired it by paying for it out of her own funds. She is from a legal standpoint in precisely the same position as though her interest were a lease of a life interest. Such being the case, we are of opinion that she is entitled to recovery in the nature of annual deductions for capital investment."

Precisely the same thing could be said of this case merely changing "new building" to "enhanced value of the trust".

In the instant case, if Mrs. Grant's children had been of age and financially able to do so they might have purchased

from the trust for $19,050.00 assets of the trust having that value and the trust could have used the money to pay off its indebtedness. If thereafter Mrs. Grant had purchased from the children a life estate in the assets so purchased by the children the economic situation of Mrs. Grant and the children and their taxable situation would have been identical with what it is now. And can there be any doubt but that such a purchase of a life interest would entitle Mrs. Grant to deduct each year the amortized cost of such a purchase of a life estate?

It is clear that in justice the taxpayer should be allowed this deduction and there is nothing in the reported cases to indicate that anything in the tax law requires an unjust result.

As to the government's contention that these payments on the part of Mr. and Mrs. Grant constitute the payment of estate taxes and consequently are not deductible under § 164(b) (4) the short answer is that it just isn't so. The estate taxes were in fact paid by the executors, for the most part in 1945 with a small additional tax in 1946, four and five years before the payments made by the Grants to the trusts.

The fact that the executors borrowed money for the payment of these estate taxes along with administrative expenses and specific legacies and had the trusts assume the portion of the debts which the executors were unable to pay out of liquid assets does not mean that when the Grants added money to their trust to enable it to pay off its debt they were paying estate taxes which had in fact been paid years before. Possibly, if there were evidence that the whole series of transactions, (1) the borrowing of money by the executors, (2) the assumption of that debt by the several trusts and (3) the payments by the Grants to their trust, had been planned at the time the executors first borrowed the money the whole transaction might be looked upon as a scheme to have the beneficiaries of the estate pay the estate taxes and later claim deductions for the amounts paid in by the beneficiaries to the trusts. But there is no evidence of any such plan and it is, in fact, obvious from the whole series of transactions that there was no such plan.

There are a number of tax court cases denying a deduction for estate taxes paid by beneficiaries but no case has been cited in which the alleged payment of taxes was made many years after the taxes had in fact been paid and under circumstances where it really was not necessary to make any further payment at all. The payments made by the Grants were not in any sense made with the thought of getting rid of any tax liabilities as none existed at the time. The sole object was to get rid of an indebtedness of the trust which had been incurred years before—and even then not to pay taxes but by assuming a debt the executors had incurred to pay not only taxes but also administrative expenses and specific legacies. And if we could assume that the $11,322.20 that Mrs. Grant put into the trust in 1950 could be traced back and said to represent a part of the $75,000.00 originally borrowed by the executors, how can the Commissioner tell us whether it is the part that the executors used to pay administrative expenses or the part they used to pay specific legacies or the part they used to pay the estate taxes?

Suppose Mrs. Grant had bought directly from the executors a life interest in some of the assets of the estate and that the executors had used the cash so acquired to pay the estate tax. Would anybody contend that Mrs. Grant had paid the estate tax? Yet here we have substantially the same sort of transaction coming five years later and with no use of the actual money advanced to pay taxes.

The situation speaks for itself and, as none of the cases on the subject are at all similar, it seems unnecessary to discuss them.

Judgment will be entered for the plaintiffs.